### TULIA FEEDLOT, INC., Plaintiff-Appellee,

v.

### UNITED STATES of America, Defendant-Appellant.

### No. 74–1928.

United States Court of Appeals, Fifth Circuit.

June 2, 1975.

---

Frank D. McCown, U. S. Atty., Ft. Worth, Tex., Robert B. Wilson, Asst. U. S. Atty., Lubbock, Tex., Louis A. Bradbury, Scott P. Crampton, Asst. Atty. Gen., Ernest J. Brown, Meyer Rothwacks, Chief, App. Sec., U. S. Dept. of Justice, Tax Div., Washington, D. C., Lawrence R. Jones, Jr., William W. Guild, Dept. of Justice, Tax Div., Dallas, Tex., for defendant-appellant.

Clarence P. Brazill, Jr., Lubbock, Tex., for plaintiff-appellee.

Before WISDOM and DYER, Circuit Judges, and KRAFT *, District Judge.

WISDOM, Circuit Judge:

Tulia Feedlot, a closely-held Texas business corporation, brought this tax refund suit to recover income taxes and interest totalling $23,798.81, which it paid under protest when the Commissioner of Internal Revenue disallowed its deduction of $54,000 for alleged guarantors' fees that it had paid, pro rata, to its director-shareholders during its tax year ending August 31, 1970. The question this case presents is whether the taxpayer may deduct as ordinary and necessary business expenses amounts paid its shareholders ostensibly as guarantors' fees. The district court, sitting without a jury, found that the amounts paid were ordinary and necessary business expenses under Int.Rev.Code of 1954, § 162(a),[1] and that they were reasonable in amount. We reverse.

## I

Tulia Feedlot, the plaintiff-appellee, was organized in 1962 for the purpose of conducting a cattle feedlot in Tulia, Texas. The feedlot grew rapidly from an initial capacity of 5,000 head in 1962 to a capacity of 28,000 head in 1970. Although the corporation had both profitable and unprofitable years during that period, it began the tax year in question with retained earnings of $318,395.27. The corporation declared no dividends until 1972, but it customarily paid a director's fee, in the amount of $2400 per year, to its directors, who are virtually the only shareholders of the corporation.

During the tax year in dispute, the stock of the corporation was principally owned by thirteen individuals. Eleven of these thirteen shareholders held equal amounts of the stock, 280 shares. Two other shareholders, a father and his son, each owned one-half of the number of shares owned by the other eleven share-

---

* Senior District Judge of the Eastern District of Pennsylvania, sitting by designation.

1. Section 162(a) provides that:

 There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

 (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

 (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; and

 (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

holders, or 140 shares each. In addition to these 3,360 shares, the corporation also had outstanding 22 shares of stock that were owned by employees of the corporation. At least some of the director-shareholders, including the President and Chairman of the Board, are also customers of the feedlot and use its facilities to feed cattle which they own individually or in partnership with others.

Tulia's business has two distinct aspects. Principally, it feeds cattle owned by its customers. When insufficient business is generated by its regular customers, however, Tulia must purchase cattle on its own account to keep the pens full and thereby minimize the feedlot's losses. This second aspect of Tulia's business requires large amounts of credit in order to purchase cattle and feed in anticipation of future sale. Financial institutions generally require that the feedlot pay 30 percent of the purchase price of the cattle. They may also require that the loans be secured by mortgages on the feedlot's cattle, feed, and real estate, and that personal guaranties be given by the feedlot's shareholders.

Since 1964, Tulia's principal shareholders have routinely guarantied loans to the corporation in proportion to their stock holdings. In 1964, each shareholder guarantied a pro rata share amounting to $5,000. This amount gradually increased over the following years so that, on January 20, 1970, each shareholder guarantied $91,000. On March 10, 1970, the amount was increased to $125,000. On July 28, 1970, each shareholder increased his guaranty to $150,000. Until July 1970, the guaranties were routinely made without any compensation to the shareholders. At a regular meeting of the board of directors on July 14, 1970, however, the board voted to increase the amount of the guaranty from $125,000 to $150,000, and to pay to each of the shareholder-guarantors an annual fee equal to 3 percent of the amount guarantied by him. Because the corporation operated on an accrual method of accounting, it paid to each shareholder the sum of $4,500 for the fiscal year that ended August 31, 1970. This fee, of course, represents 3 percent of the loan guaranty of July 28, 1970, whereas the amounts actually guarantied by the shareholders during the first eleven months of the fiscal year were considerably less. As a result of these calculations, Tulia paid a total of $54,000 in guarantors' fees for the tax year in question. Interest payments during the same period amounted to $87,991.07.

Although Tulia did not declare a dividend until 1972, the possibility of a dividend had been discussed every year. Evidence adduced at trial demonstrates that some of Tulia's principal shareholders, dissatisfied with the $2400 annual directors' fees, were impatient with the corporation's dividend policy and wished to have a more substantial return on their investments. The lack of any evidence to show how the 3 percent figure was determined is particularly significant in this light. That figure was simply the lowest amount that the dissatisfied, pro-dividend directors would agree to accept. It did not, in any way, reflect a rational calculation of the risks involved in the guaranties. Indeed, at least two of the guarantors made guaranties in excess of their respective net worths. Moreover, in 1972, when the corporation declared its first dividend, the director-guarantors increased the rate of return on their guaranties from 3 percent to 6 percent.

■ As a result of deducting the full $54,000 paid in guarantors' fees from its income in the tax year in question, the corporation had a net loss of $6,309.07. It paid no dividend. At the same time, each of the corporation's principal shareholders received income from the corporation in the nature of a $2400 director's fee and a $4500 guarantor's fee. In these circumstances, we think that the $4500 guarantor's fee was a distribution of property made by a corporation to its

shareholders under 26 U.S.C. § 316,[2] and not an ordinary and necessary business expense within the meaning of 26 U.S.C. § 162(a). See Giles Industries, Inc. v. United States, Ct.Cl.1974, 496 F.2d 556, 563.

## II

In order for payments to qualify as ordinary and necessary business expenses under Int.Rev.Code of 1954, § 162(a), they must be appropriate, helpful, and of a common or frequent occurrence in the type of business carried on by the taxpayer. Lilly v. Commissioner of Internal Revenue, 1952, 343 U.S. 90, 72 S.Ct. 497, 96 L.Ed. 769; Deputy v. Du Pont, 1940, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416; Welch v. Helvering, 1933, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212. The payments must be ordinary, not in the sense that they are habitually or normally made by a single taxpayer, but in the sense that they are of a known type and commonly made, in some circumstances, by persons in the type of business carried on by the taxpayer. The expenses of a lawsuit to safeguard a taxpayer's business, for instance, may be "unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part". Welch v. Helvering, 1933, 290 U.S. 111, 114, 54 S.Ct. 8, 9, 78 L.Ed. 212. The payments must also be ordinary in the sense that they represent expenses that are currently deductible, and not capital expenditures which, if deductible at all, must be amortized over the useful life of the asset. Commissioner of Internal Revenue v. Tellier, 1966, 383 U.S. 687, 689–90, 86 S.Ct. 1118, 16 L.Ed.2d 185. They must be reasonable in amount.

Limericks, Inc. v. Commissioner of Internal Revenue, 5 Cir. 1948, 165 F.2d 483.

Expenses must be necessary in the sense that they are, at least, appropriate and helpful for the development of the taxpayer's business. Commissioner of Internal Revenue v. Tellier, 1966, 383 U.S. 687, 689, 86 S.Ct. 1118, 16 L.Ed.2d 185. Section 162(a) does not require that expenses be necessary in a philosophic or logical sense. As one commentator has suggested, a reading of Section 162(a) based on the logical meaning of "necessary" would "place the courts and the Commissioner in the position of business efficiency experts reviewing the commercial decisions of the taxpayer, a function which they are ill-fitted to perform." Comment, Business Expenses, Disallowance And Public Policy: Some Problems of Sanctioning With The Internal Revenue Code, 72 Yale L.J. 108, 113, n. 20 (1962). Because courts are reluctant to review commercial decisions made by a taxpayer, they have generally looked to the actual practices of businessmen to determine the standard. In determining whether expenses are ordinary and necessary under Section 162, the test is whether a hard-headed businessman, under the circumstances, would have incurred the expense. Cole v. Commissioner of Internal Revenue, 2 Cir. 1973, 481 F.2d 872, 876. This rule is, of course, subject to numerous limitations. First, it is only the business practices of a hard-headed businessman, and not his tax avoidance schemes, that are subject to judicial deference. Second, the practices of an entire trade or profession may be infirm from the standpoint of the administration of the reve-

---

2. Section 316 provides that:

For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the

earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

nue laws. Third, special relationships between the contracting parties may, as here, limit the utility of the hard-headed businessman principle.

 The law presumes, for instance, that corporate officers make expenditures of corporate funds only when they consider them to be in the interest of the corporation and its shareholders. Armour & Company v. Wantock, 1944, 323 U.S. 126, 130–31, 65 S.Ct. 165, 89 L.Ed. 118. Transactions between related taxpayers or between a close corporation and its principals, who may have a multi-dimensional relationship with the corporation, must be subject to close scrutiny. United States v. Ragen, 1942, 314 U.S. 513, 62 S.Ct. 374, 86 L.Ed. 383. In these circumstances, it is the nature and origin of a transaction, rather than its form, that must be accorded controlling weight. Interstate Transit Lines v. Commissioner of Internal Revenue, 1943, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607.

 The Commissioner's disallowance of a taxpayer's deduction for payments claimed as ordinary and necessary business expenses carries a presumption of correctness. The taxpayer must meet the burden of proving that the Commissioner's determination is wrong. Welch v. Helvering, 1933, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212. Cf. 4A Mertens, Law of Federal Income Taxation § 25.03 (1972). The taxpayer must not only prove that the Commissioner was wrong, but he also has the burden of establishing the facts from which an exact determination of the proper deduction may be made. Lenox Clothes Shops v. Commissioner of Internal Revenue, 6 Cir. 1943, 139 F.2d 56.

 Transactions between related taxpayers are subject to special scrutiny. See Dillin v. United States, 5 Cir. 1970, 433 F.2d 1097. In determining the true character of a transaction between a close corporation and its principals, the expressed intent of the corporation is entitled to less weight than is the intent of a publicly-held corporation in similar circumstances. Where, for example, corporate directors, who were also the sole shareholders and the creators of a liability, predictably placed in the corporate minutes statements to the effect that a settlement of the liability by the corporation was essential to its continued success, we held that judicial skepticism was both necessary and appropriate. United States v. Smith, 5 Cir. 1969, 418 F.2d 589, 593–94. As Judge Simpson noted in *Smith,* "[t]he separate legal identity of these corporations should not obscure the fact that they are operated by their shareholders in a manner thought best calculated to serve the latter's interests. What is deemed best for the shareholders is deemed best for the corporation, and vice versa." *Id.,* at 594. In the analogous area of shareholder-employee compensation, we have held that a deduction claimed for compensation paid to shareholder-employees will not be denied *merely* because payments are made proportionately to shareholdings, when other evidence persuasively establishes the reasonableness of such compensation solely on the basis of employment-related criteria. United States v. Safety Engineering & Supply Co., Inc., 5 Cir. 1967, 374 F.2d 885. The burden in such cases is, of course, substantial.

Tulia introduced evidence to show that the Bank of Tulia, one of the corporation's pre-1970 credit sources, would not have lent it the money it needed without the personal guaranties of the corporation's shareholders. It also introduced evidence to show that such guaranties were commonly required of closely-held corporations in the cattle feedlot business. No evidence was presented, however, to show that it is customary for a cattle feedlot's shareholders to charge a fee for their guaranties. Nor was any evidence presented to show what fees, given the risks involved, would be reasonable in the circumstances here. The corporation now argues that "it is evident from the decided cases that guarantor's fees are *not unknown* in other businesses." As Justice Douglas noted in Deputy v. Du Pont, 1940, 308 U.S. 488, 495, 60 S.Ct. 363, 367, 84 L.Ed. 416, "the

fact that a particular expense would be an ordinary or common one in the course of one business and so deductible . . does not necessarily make it such in connection with another [one]." The taxpayer's failure to meet the burden of proof is compounded here by the absence of any readily ascertainable market price for guaranties for corporations of its type and size. In August 1970, it had paid-in capital of $325,682.57, capital surplus of $89,841.75, and outstanding loans of $1,800,000. Tulia presented no evidence as to the possibility and likely cost of obtaining these guaranties in an arm's length transaction in the market.

The presence of evidence demonstrating that it is customary for businesses of Tulia Feedlot's size, type, and financial status to pay a 3 percent guaranty to their shareholder-director-guarantors would not, of course, be dispositive. A whole segment of the business community may profit from this method of paying dividends to their corporate principals without the burdensome necessity of declaring a corporate dividend that is twice liable to federal income taxation. We think that the absence of such evidence, however, is dispositive. In the absence of such evidence, the district court could not properly find that the guaranty was an ordinary and necessary business expense because it could not be sufficiently informed as to the economic realities of the transaction.

Although this Court has not previously considered the precise issues presented here, the Tax Court has done so in two similar cases. In Universal Milking Machine Co. v. Commissioner, 1926, 4 B.T.A. 506, the Tax Court disallowed a taxpayer's deductions for amounts that it paid to shareholders who had jointly and severally guaranteed its loans. The Court found that the fees charged were exorbitant and that the shareholders incurred no real risk. It did not reach the issue whether a reasonable fee paid to such shareholders for guarantees that involved a genuine risk would have qualified as an ordinary and necessary business expense.

In A. A. & E. B. Jones v. Commissioner, 1960, 19 T.C.M. 1561, the Tax Court allowed a corporation's deduction of guarantor's fees paid to two shareholders as an ordinary and necessary business expense. Even assuming that the legal standards applied by the Tax Court in A. A. & E. B. Jones are correct, we think that that case is distinguishable. In A. A. & E. B. Jones, the Court found that the guaranties obtained from the shareholders could have been obtained elsewhere and that the fees for those guaranties were reasonable in terms of those customarily charged in the market under similar circumstances. "The petitioner called a number of witnesses who testified that such payments were usual and that they knew of comparable payments having been made under somewhat similar circumstances." See J. E. Craig Finance Co., Inc. v. United States, W.D.S. C.1962, 200 F.Supp. 554; Builders Steel Co. v. Commissioner of Internal Revenue, 8 Cir. 1952, 197 F.2d 263. Cf. Pacific Grains, Inc. v. Commissioner of Internal Revenue, 9 Cir. 1968, 399 F.2d 603.

Unlike the taxpayer in A. A. & E. B. Jones, Tulia Feedlot presented no evidence in the district court to show that the guarantors' fees paid to its director-shareholders were customary or reasonable in amount. The scope of our review is limited here by the "clearly erroneous" principle of F.R.Civ.P. 52(a). A finding is clearly erroneous within the meaning of F.R.Civ.P. 52(a) when, although there is evidence to support a district court's finding, the appellate court, after a review of all the evidence, is left with the definite and firm conviction that a mistake has been made. United States v. Smith, 5 Cir. 1969, 418 F.2d 589, 594; Pennington v. Colonial Pipeline Co., 5 Cir. 1968, 387 F.2d 903. The district court found that the guarantors' fees paid by Tulia Feedlot to its director-shareholders were ordinary and necessary business expenses that were also reasonable in amount. In light of Tulia's failure to present evidence, and thus meet its burden of proof, on elements essential to that determination,

we think that the district court's findings were clearly erroneous. The Commissioner determined that the payments were a distribution of property to shareholders under Int.Rev.Code § 316, and the corporation failed to rebut the presumption of correctness accorded the Commissioner's determination.

Finally, Tulia contends that the government has shifted its theory on appeal and now argues for reversal on the ground of the corporation's thin capitalization. Although the government may have put greater emphasis on the thin capitalization argument on appeal, we do not think that such greater emphasis is essential to our reversal of the district court's decision. We hold only that the taxpayer corporation failed to sustain its burden of proof.

The judgment of the district court is reversed.