**OLTON FEED YARD, INC.,**
**Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

No. 78–2908
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

April 2, 1979.

---

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5 Cir., 1970, 431 F.2d 409, Part I.

Edward R. Smith, Lubbock, Tex., Graddy Tunnell, Plainview, Tex., for plaintiff-appellant.

Kenneth J. Mighell, U. S. Atty., Fort Worth, Tex., M. Carr Ferguson, Asst. Atty. Gen., Tax Div., Gilbert E. Andrews, Act. Chief, App. Sect., U. S. Dept. of Justice, Washington, D. C., Louise Parks, Dallas Field Office, Tax Div., U. S. Dept. of Justice, Dallas, Tex., Grant W. Wiprud, Philip I. Brennan, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before COLEMAN, FAY and RUBIN, Circuit Judges.

PER CURIAM:

This is an appeal by Olton Feed Yard, Inc. [taxpayer] of a jury verdict denying the company a refund in its suit against the government for $63,775.66 in taxes on payments to shareholders of the corporation which the Commissioner of Internal Revenue deemed to be dividends under 26 U.S.C. § 316.[1] The jury found that these payments to the shareholders were not ordinary and necessary business expenses under Int.Rev.Code of 1954, § 162(a),[2] and therefore, could not be deducted from the taxable income of the corporation. On appeal

---

1. Section 316 provides that:

For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—
   (1) out of its earnings and profits accumulated after February 28, 1913, or
   (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.
Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

2. 26 U.S.C. § 162(a) provides that:

There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
   (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;
   (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; and
   (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

the taxpayer asserts that the trial court erred in denying its motion for judgment notwithstanding the verdict and that the court made several errors in instructing the jury. We find these contentions meritless and affirm the jury verdict.

Olton Feed Yard, Inc. was organized in 1969 in Olton, Texas, for the purpose of providing feed for both company-owned cattle and cattle owned by other parties. The stock was originally issued to approximately twenty individuals, five of whom were directors who owned about one-half of the outstanding stock. Most of the shareholders were also customers of the feed yard and used its facilities to feed cattle which they owned individually.

Initially, approximately three quarters of a million dollars was borrowed from the Plainview Production Credit Association (PPCA) in the form of a line of credit for construction of the feed yard facilities. In order to obtain this loan, each of the shareholders was required to sign a guarantee agreement in proportion to his stock ownership in the corporation. Various other loans were obtained from PPCA between 1969 and 1973, and in each instance, repayment guarantees were required of the shareholders. The shareholders did not, however, receive fees for signing any of these guarantees.

In June of 1973 the taxpayer purchased with its own funds two grain elevators in order to insure an adequate supply of grain for the feed yard operation. It was determined that to operate the grain elevators competitively, the corporation would have to be in a position to purchase large amounts of grain. Therefore, in November of 1973 taxpayer obtained the necessary financing for the new operation through PPCA which agreed to extend a line of credit of $3,300,000, the estimated cost for grain sufficient to fill the elevators to 75 percent of capacity. As security for the loan, PPCA required a security agreement on the gain purchased (estimated value in excess of $4,000,000) and a deed of trust on 320 acres of land owned by taxpayer. Additionally, PPCA required that the shareholders of the corporation guarantee the debt in proportion to their stock ownership in the company.

In order to inform the shareholders of the need for their guarantees, the board of directors had called a stockholders' meeting in August of 1973. The shareholders were told at this time that a reasonable fee, the amount of which would be determined at a later date, would be paid them for their guarantees. Thereafter, all shareholders had signed the agreements. They received no indemnity agreement, note, or other written evidence of an obligation on the part of the taxpayer to pay them a fee for their guarantees. Although a few of the shareholders testified that they would not have signed the guarantees without the promise of a fee, most indicated that they probably would have signed them, because they felt that signing the guarantees would protect or enhance their investment in the corporation.[3]

The following year in August of 1974, the eleventh month of the taxpayer's fiscal year, its board of directors approved a resolution to pay the shareholders a fee of 3¾ percent of the entire line of credit ($3,300,-000). The amount of the fee was determined by checking with representatives of other feedlots, bankers, and lenders in regard to the question of what a reasonable guarantor's fee would be. After such information was obtained, the 3¾ percent figure was determined through negotiations among the members of the board of directors and their advisors.

The shareholders were not required to guarantee more than the outstanding loan balance which never exceeded $1,540,000. The ¾ percent fee was paid, however, on

**3.** Several shareholders did qualify this statement by saying that they were willing to sign if a majority of the other shareholders or a sub-

stantial number of the others signed the guarantees.

the assumption that the entire line of credit had been guaranteed. The taxpayer established no reserve for the payment of the fees and so borrowed the amount from PPCA. The entire amount of the fees totaling $123,750 was paid during fiscal year 1974.

Documents in the record, as well as the testimony of witnesses at trial, indicate that from its inception through the taxable year in issue (fiscal year 1974), the feed yard had profitable years. The shareholder equity in the feed yard was $873,728 at the close of fiscal year 1973. Retained earnings increased from $65,178 in 1969 to $544,617 in 1974. In fiscal 1974, after deducting the $123,750 paid as fees to the guarantors, the taxpayer had, in addition to the retained earnings of $544,617, taxable income of $346,747 and net profits of $123,812. In no year did it pay dividends, ostensibly because there was no money to pay them. The jury found, however, that the funds paid the shareholders as guarantor's fees in 1974 were, in effect, dividends, and therefore, were not deductible as ordinary and necessary business expenses.

■ The trial judge refused to set aside this verdict on a motion for JNOV. Such a motion should be granted only where the facts and inferences are so overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. "[I]f there is substantial evidence opposed to the [motion], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the [motion] should be denied . . . ." *Boeing Co. v. Shipman,* 5 Cir. 1969, 411 F.2d 365, 374. A review of the trial transcript in this case gives ample indication that there was sufficient evidence presented supporting both sides of the deductibility issue to warrant allowing the jury to decide the question.

■■ The crucial question for the jury in this case was whether it was *necessary* for the taxpayer to pay the shareholders a fee in order to get them to sign guarantees for the loan.[4] Generally, whether a corporate distribution is a dividend or not is a question of fact. *Hardin v. United States,* 5 Cir. 1972, 461 F.2d 865, 872. In a tax refund case the Commissioner of Internal Revenue's ruling carries a presumption of correctness, and the taxpayer has the burden of proving by a preponderance of the evidence that the Commissioner's determination is wrong. *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

■ In this case there was sufficient evidence to support the jury's finding that the taxpayer did not meet its burden of proof and that the payments to the shareholders constituted constructive dividends. The taxpayer's financial records indicate that it had a profitable year in 1974, as in all previous years, and was in a position to distribute some of these profits to its shareholders as dividends. Notably, the taxpayer had never paid dividends in spite of its profit-making status, and several of the shareholders testified that they did expect a return on their investment.

There is also evidence to establish that the shareholders signed the guarantees in order to protect and enhance their investment in the corporation. Although some of the shareholders testified that they would not have signed the guarantees if the fee had not been promised, many of them admitted on cross-examination that if the board of directors had decided to pay no fee, they would have accepted no fee, and if the corporation had not been in a financial position to pay a fee, they would have wait-

4. In *Tulia Feedlot, Inc. v. United States,* 5 Cir. 1975, 513 F.2d 800, *cert. denied,* 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281, a case involving facts very similar to this case in which we reversed the district court's ruling that the fees were ordinary and necessary business expenses, we stated that in determining deductibility, the reasonableness of the amount of the payment must also be considered. This is not an issue in this case, however, because the government did not challenge the reasonableness of the payments as guarantor's fees.

ed to receive such a payment until the corporation was able to pay. At the time the guarantees were signed, none of the shareholders knew the amount they would be paid or when they would receive the payment.

The testimony of taxpayer's expert witness, Dr. Dukes, would not by any means overwhelmingly lead the jury to conclude that it was a common practice for other feed lots to pay guarantors fees. He testified that he had contacted 98 feed lots and found that of that number, only nine had paid guarantors fees in 1974. On cross-examination he admitted that even for these feed lots he did not know the amount of the loans or line of credit obtained by the companies, the security given, nor the financial condition of those companies.

Even if the taxpayer had succeeded in presenting evidence that it was customary for feed lots comparable to taxpayer in size, type, and financial state to pay guarantor's fees to shareholders, this would not have been sufficient to carry taxpayer's burden. In *Tulia Feedlot, Inc. v. United States*, 5 Cir. 1975, 513 F.2d 800, *cert. denied*, 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281, under similar circumstances, this court commented as follows:

> The presence of evidence demonstrating that it is customary for businesses of Tulia Feedlot's size, type, and financial status to pay a 3 percent guaranty to their shareholder-director-guarantors would not, of course, be dispositive. A whole segment of the business community may profit from this method of paying dividends to their corporate principals without the burdensome necessity of declaring a corporate dividend that is twice liable to federal income taxation. We think that the absence of such evidence, however, is dispositive. In the absence of such evidence, the district court could not properly find that the guaranty was an ordinary and necessary business expense because it could not be sufficiently in-

formed as to the economic realities of the transaction.

*Id.* at 806.

Finally, the evidence established that the payments made to the shareholders were in proportion to their stock ownership and otherwise resembled a dividend. That taxpayer waited until the eleventh month of a fiscal year in which it had substantial taxable income to pay the fee is also indicative of its true status. The jury was justified in finding that these payments were a method of distributing the earning and profits of the corporation to its shareholders in the form of a constructive dividend.

Appellant taxpayer also asserts several errors made by the trial judge in instructing the jury. Having examined the instructions as a whole, we have no doubt that the jury was properly guided in its deliberations and that it was not misled in any way in understanding the issues presented or its duty to determine those issues. *McCullough v. Beech Aircraft Corp.*, 5 Cir. 1979, 587 F.2d 754, 759, *citing, Borel v. Fibreboard Paper Products Corp.*, 5 Cir. 1973, 493 F.2d 1076, 1100, *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), and *Kyzar v. Vale Do Ri Doce Navegacai, S.A.*, 5 Cir. 1972, 464 F.2d 285, 290, *cert. denied*, 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973).

Under these circumstances we affirm the jury verdict of the District Court.

AFFIRMED.