DEMIAN, LTD., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Demian, Ltd. v. Commissioner
Docket No. 22241-80.
United States Tax Court
T.C. Memo 1983-683; 1983 Tax Ct. Memo LEXIS 106; 47 T.C.M. (CCH) 311; T.C.M. (RIA) 83683; November 15, 1983. Michael R. Harris, for the petitioner. J. Leon Peace, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: Respondent determined a deficiency of $72,110 in petitioner's Federal income tax for the taxable year ending December 31, 1974. The only issue for our decision is whether petitioner is entitled to deduct under *107 section 162(a)(1)[1] salary paid during the taxable year 1974 to its president in excess of the amount allowed by respondent. The resolution of this issue will determine the amount of the deduction under section 404 for petitioner's contributions made on behalf of its president during the taxable year 1974 to qualified pension and profit-sharing plans. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference and are found accordingly. Demian Ltd. (petitioner) was a corporation organized in February 1972 under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania. Petitioner filed a Federal income tax return for the taxable year of 1974 with the Internal Revenue Service Center in Philadelphia, Pennsylvania. During 1974, petitioner's sole shareholder was Michael Driban (Michael), who was also an employee of petitioner and served as its president.Judith Driban (Judith), Michael's spouse, *108 was employed as petitioner's secretary during that year. Petitioner was in the business of importing and selling leather goods at wholesale. Designed by petitioner, the goods were primarily men's leather jackets and were manufactured in Spain according to petitioner's specifications. Michael received a college degree in education and taught school in Pennsylvania prior to entering the clothing business. Michael was first employed in the men's clothing industry with a company in Baltimore. This company owned twenty to twenty-five retail stores.He worked there four years, gaining experience in sales and learning systems for controlling inventory and warehousing. After his association with the company in Baltimore terminated, Michael was employed by Peter's Sportwear, a clothing manufacturer in Philadelphia. When Peter's Sportwear entered into import trade, Michael became its import director. In that capacity he handled bank negotiations, controlled purchases, and was responsible for the production and distribution of samples. Michael became frustrated with his employment at Peter's Sportwear, primarily because he was not involved in the styling or sales aspects of the *109 clothing manufacturing business. Michael believed that the men's leather clothing market needed a high-fashion, trim-fitting garment, of high quality, that would be flattering to the young or athletic man. Peter's Sportwear was not manufacturing such a garment. Consequently, Michael left Peter's Sportswear and formed petitioner, becoming its president. In 1974 petitioner had three employees, excluding outside salesmen--Michael, Judith and a stock clerk. The stock clerk's duties primarily were to pack, seal, and make proper notations on boxes for shipping. The stock clerk did not have any executive responsibilities. As secretary for petitioner, Judith's duties included the following: Accounting; style and design of goods within product line; coordination of activities for trade shows and sales promotion; merchandise acquisition; and customer relations. Some of Michael's duties, as will be discussed below, overlapped with Judith's. However, Michael had primary responsibility in several of the areas in which Judith worked and Judith worked in those areas as his subordinate. Michael was responsible for the following: Designing, ordering and buying the product line; supervising *110 the manufacture of the product in Spain; inspecting goods and manufacturing operations; importing; financing; selling; and marketing. In essence, Michael's duties involved all phases of creating the product, i.e., from making the design to following up the production and distribution of the product, from the day the concept was reduced to a sketch until the time it was delivered to customers. As petitioner's designer, Michael created a line of all-leather garments made from high quality skins. These form-fitting leather garments were not previously available on the market; Michael developed a market for them. Petitioner had about fifteen styles in its line at any particular time. In order to come up with fifteen styles for sale, Michael started out with approximately forth original designs. Judith's involvement in design of the products was minimal. Michael was also responsible for production of the garments. He went to Spain to arrange for the manufacture of the leather garments. He worked with the tanneries selecting skins, supervising the processing of skins and selecting colors. At times he had to work with chemists to develop new colors. Michael was also responsible for *111 following-up the manufacturing details to ensure that everything was done properly. He supervised the selection and production of colors and materials used for linings, buttons, zippers, snaps, and buckles. In addition, Michael was responsible for quality control and timeliness of delivery. His duties in that capacity included supervising the manufacture of garments, insuring that all facets of production were running smoothly and maintaining quality. He made sure that deliveries were timely made. He frequently traveled to Spain to inspect garments before their release. Michael was responsible for handling the goods in the United States after shipment from Spain. He made the necessary arrangements with customers' brokers, arranged for inland transportation and inspected the goods. Michael handled all financial matters for petitioner, including dealing with local banks for lines of credit, dealing with customers and negotiating prices overseas. Michael was also responsible for the company's marketing and sales operations. As the person in charge of sales, Michael managed and coordinated the activities of several outside salemen. He also spent about one day a week in New *112 York ina sales capacity, meeting with national buyers, negotiating and putting together sales programs, setting up trade shows, making presentations and selling petitioner's products. In undertaking all of his responsibilities, Michael worked on the average a six-day week and a twelve-hour day.Included in this time were approximately fifteen hours per week, on the average, of sales activities. On many occasions he worked a seven-day week and a more than twelve-hour day. Michael's 1974 compensation was paid in conformance with an employment agreement between petitioner and Michael entered into on January 1, 1974. By its terms, the employment agreement covered Michael's compensation for 1974 and 1975.The employment agreement provided, in part, that Michael would receive compensation in the amount of $2,000 per week, plus 2.5 percent of gross sales, if sales exceeded $1,000,000 but were less than $1,500,000. If sales were less than $800,000, no amount in excess of $2,000 per week would be paid to Michael. The $2,000 weekly sum was payable at the rate of $1,500 per week, the balance of $500 per week to be paid at such times deemed desirable and appropriate by petitioner's Board *113 of Directors, but no later than the date for filing of petitioner's Federal income tax return, including extensions thereof. During 1974 petitioner had several outside salesmen who were paid approximately $71,000 in the aggregate during that year on a commission basis. One of those salesmen received approximately $51,000 in sales commissions from petitioner in 1974, even though he did not devote all of his time to selling petitioner's products. In 1974 this individual also represented two other men's clothing manufacturers. In addition, he operated and represented his own men's jewelry company. An analysis of petitioner's income and compensation data for the years 1972 through 1975 is set forth as follows: 1972 a
1973
1974
1975
Gross Sales
$221,052 $817,879
$1,320,751
$956,546
Less: Cost of
goods sold
155,390 603,708
951,390
694,459
Gross Profit
65,662 214,171
369,361
262,087
Total Income
67,934 227,881
398,082
281,451
Less: Total Officer
Compensation
15,710 77,000
157,819
34,400
Total Pension/
Profit-Sharing
Contributions
19,520
39,455
8,600
Compensation Paid
to Other
Employees
15,230 2,900
10,180
38,807
Commissions Paid
to Sales
Representatives
1,031 48,587
71,217
34,794
Other Deductions
36,585 b 61,964
101,879
133,527
Net Income (Loss)
Before Federal Tax
(622)
17,910
17,532
31,323
After Federal Tax
(622)
14,069
14,079
25,546
Dividends Paid
5,000
*114 From 1972 through 1975 Michael and Judith received the following amounts from petitioner: Year
Judith
Michael
1972
$15,710
1973
77,000
1974
$20,800
137,019
1975
4,400
30,000
During the years 1972 through 1975 petitioner made pension and profit sharing plan contributions for Judith and Michael, as follows: Year
Judith
Michael
1972
1973
$19,250
1974
$5,200
34,255
1975
1,100
7,500
On its Federal income tax return for the taxable year 1974 petitioner claimed a deduction in the total amount of $157,819 for salaries and wages paid during such year to its corporate officers, Michael and Judith. In addition, petitioner claimed a deduction under section 404 in the amount of $39,455 [2] for contributions paid on behalf of corporate officers to petitioner's qualified pension and profit-sharing plans. *115 In the notice of deficiency respondent disallowed $123,419 of the total compensation claimed, thereby allowing a deduction of $30,000 for Michael's compensation and a deduction of $4,400 for Judith's compensation. The basis for respondent's disallowance was that such excess amoutn did not represent under section 162(a)(1) a reasonable allowance for salaries or other compensation paid for personal services actually rendered. From the deduction claimed for contributions paid to pension and profit-sharing plans, respondent disallowed the portion that exceeded $8,600. The amount allowed was computed by applying the percentage limitations on deductibility of contributions under section 404 to the amount of salaries allowed by respondent as deductions under section 162, i.e., 25 percent of $34,400. At trial responde tconceded that the total compensation paid to Judith of $20,800 in 1974 was reasonable and that $68,750 was a reasonable amount to be paid for Michael's services in 1974. Respondent engaged an expert two prepared a report and testified at trial. The expert's report and testimony supported respondent's revised compensation figures. In addition, respondent conceded that *116 petitioner's total deduction for contributions paid to pension and profit-sharing plans should be correspondingly increased to $22,387.50 (25 percent of $89,550). Therefore, only deductions claimed by petitioner for compensation paid to Michael in excess of $68,750 and for contributions to pension and profit-sharing plans made on Michael's behalf in excess of $17,187.50 (25 percent of $68,750) remain in dispute. ULTIMATE FINDING OF FACT For the taxable year 1974 petitioner is entitled to a deduction of $101,019 under section 162(a)(1) for reasonable compensation paid to Michael for personal services actually rendered. OPINION Section 162(a)(1) allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered." Section 1.162-7, Income Tax Regs., provides, in part, as follows: Compensation for personal services.--(a) There may be included among the ordinary and necessary expenses paid or incurred in carrying *117 on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. (b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows: * * * (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed *118 as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.
(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned. The test of deductibility requires that (1) the amounts paid must be reasonable and (2) the payments must be entirely for services. Sec. 1.162-7(a), Income Tax Regs.; Nor-Cal Adjusters v. Commissioner,503 F.2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Klamath Medical Service Bureau v. Commissioner,29 T.C. 339, 347 (1957), affd. 261 F.2d 842 (9th Cir. 1958). *119 Whether the requirements for deductibility are met is a question of fact to be determined in light of all of the facts and circumstances in the case. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975). The relevant factors to be considered, as stated by the court in Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court, include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * Furthermore, the compensation must be closely examined where the payments at issue are made to *120 a controlling shareholder. Tulia Feedlot, Inc. v. United States,513 F.2d 800, 805 (5th Cir. 1975). Respondent's determination is presumptively correct, and petitioner has the burden of proving it erroneous. Botany Worsted Mills v. United States,278 U.S. 282 (1929); Rule 142(a), Tax Court Rules of Practice and Procedure. If petitioner succeeds in proving that respondent's determination is erroneous, the presumption of correctness is rebutted, and we must determine from the record as a whole what was a reasonable compensation under the particular facts and circumstnaces of this case. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,supra at 568. We think that petitioner has met his burden of establishing that a reasonable compensation for Michael's 1974 services exceeds $68,750.[3] The factors that we think control in this case are the nature, extent and scope of the employee's services, their value to the employer, the time required of the employee, the complexities of the business and the employee's capabilities and *121 qualifications. Citing Weaver Paper Co., Inc. v. Commissioner,T.C. Memo. 1980-72 and Appleton Electric Co. v. Commissioner,T.C. Memo. 1967-211, petitioner contends that, in determining a reasonable compensation for Michael's services, his various duties, responsibilities, efforts and the results of those efforts should be considered. We agree. In Weaver Paper Co., this Court considered the value of the employee's duties as both a salesman and a manager in ascertaining a reasonable compensation to the employee, where each of the duties contributed to the success of the taxpayer's business. In Appleton Electric Co., in making a determination of reasonable compensation, this Court took into consideration the value of the employee's services as an executive *122 and as an inventor of products manufactured by the taxpayer. In this case, in addition to being president, Michael was a "jack-of-all-trades" for petitioner. Michael's duties involved all phases of creating the product, from designing it to following up on production and distribution. In addition, Michael not only supervised sales but also directly engaged in sales activities. We note that one outside salesman was paid $51,000 by petitioner in 1974 for selling petitioner's products on a part-time basis. In undertaking all of his responsibilities, Michael worked on the average a six-day week and a twelve-hour day.It was due to Michael's efforts that the business was successful. Furthermore, although Michael did not possess a degree in business, we think that he gained valuable experience prior to his employment with petitioner, particularly in the field of import trade. Such experience was essential to petitioner, since the goods petitioner sold were manufactured overseas. Moreover, Michael developed the market for petitioner's goods. Michael's prior experience in the men's clothing industry gave him an insight into the market by providing him with ideas for what products *123 would sell well.
After reviewing and weighing all of the facts and circumstances, we are satisfied that petitioner has met its burden of showing respondent's determination to be erroneous. We were generally impressed with Michael's testimony and found him to be very credible and convincing. But, we are troubled by the fact that Michael's compensation fluctuated greatly in the years 1972 through 1975, depending on the income and earnings of petitioner. Also, the amount of the deduction as a percentage of taxable income of the corporation was much greater in 1974 than that in 1973 and 1975. For these reasons, we think that a portion of the total payment was not in fact payment purely for services rendered by Michael, even though petitioner paid a dividend of $5,000 in 1974. Thus, we are unwilling to allow petitioner the full amount of the deduction that it claims under section 162. Based upon our careful review of the entire record herein, and using our best judgment, we find and hold that petitioner is entitled to a deduction under section 162(a)(1) for the compensation reflected in our ultimate finding of fact. In arriving at our conclusion we do not give much weight to the *124 testimony and report of respondent's expert witness (witness). The witness testified that, in his opinion, a reasonable compensation for the 1974 services performed by Michael would be $68,750. The witness based this compensation figure primarily on average compensation of officers of various companies in various industries. However, we think that the corporations described as comparable by the witness were not particularly comparable with petitioner in size, profitability or type of business. No comparisions were made to businesses of petitioner's size that wholesale men's clothing products similar to those sold by petitioner. The compensation of officers of other companies to which Michael's compensation was compared included only cash compensation; no information concerning non-cash compensation and benefits was provided. Moreover, in arriving at his conclusion, we think that the witness did not adequately take into account the various all encompassing duties performed by Michael for petitioner, particulary his positions as designer and seller of petitioner's products. While the witness presented no information on what were the exact duties of chief executive officers of *125 the companies to which petitioner was compared, we doubt that many, if any, of them designed their companies' products themselves. Generally, we were unimpressed by the witness' testimony and we do not think that the compensation figure arrived at by the witness was reasonable under the particular facts and circumstances of this case. Petitioner contends that the total amount paid Michael in 1974 was reasonable compensation because it was paid pursuant to an employment agreement that provided for a reasonable compensation. We do not agree. The employment agreement does not withstand close scrutiny.The agreement between petitioner and its sole shareholder (who is also petitioner's president and most important employee) is not at arm's length. Although by its terms, the agreement covered the years 1974 and 1975, the agreement was in fact in operation for only one year and was totally ignored by petitioner in fixing Michael's 1975 compensation. Under these circumstances we have as much confidence in the worth of this agreement as petitioner had--almost none. Petitioner also contends that *126 the compensation provided for under the agreement was intended to cover undercompensated services performed by Michael in 1972 and 1973 and, for that reason, the total amount paid to Michael in 1974 should be deductible. We do not agree. The agreement does not explicitly provide that it covers compensation for past services. Moreover, petitioner must not only establish the fact of undercompensation but also the amount of the undercompensation in order to be allowed a deduction. American Foundry v. Commissioner,59 T.C. 231, 239 (1972), affd. on this issue, 536 F.2d 289 (9th Cir. 1976). Petitioner has not sufficiently established either of these facts to our satisfaction. We have carefully examined the parties' remaining arguments and find them unpersuasive. The parties agree that the section 404 deduction for contributions to pension and profit-sharing plans equals 25 percent of the section 162(a)(1) deduction. Having decided the amount of the section 162(a)(1) deduction, we find and hold that petitioner is entitled to a deduction of $25,255 under *127 section 404 for contributions paid on Michael's behalf to its qualified pension and profit-sharing plans during taxable year 1974. To give effect to the parties' concessions and to reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue, unless otherwise indicated.↩
a. Not a full taxable year. ↩
b. Includes net operating loss carryover from 1972.↩
2. Petitioner computed this amount by applying the maximum percentage limitations for deductibility of such contributions provided by section 404(a)(1), (a)(3) and (a)(7)↩ to the total amount of salaries and wages paid, i.e., 25 percent of $157,819.
3. Respondent determined that reasonable compensation for Michael's services was $30,000 and for Judith's services was $4,000. The notice of deficiency was based on these amounts. At the time of commencement of the trial, respondent conceded that Judith's compensation was properly allowable in full and that $68,750 of the compensation paid to Michael was properly allowable.↩