**TULIA FEEDLOT, INC.**

v.

**The UNITED STATES.**

No. 322–81T.

United States Claims Court.

Aug. 9, 1983.

Elgin E. Conner, Jr., Lubbock, Tex., for plaintiff; Allen L. Price, Lubbock, Tex., of counsel.

Jay G. Philpott, Jr., Washington, D.C., for defendant; Asst. Atty. Gen., Glenn L. Archer, Jr., and Theodore D. Peyser, Jr., Washington, D.C., of counsel.

## OPINION

WHITE, Senior Judge.

This is an action for the recovery of federal income taxes and interest in the total amount of $36,059.88, which Tulia Feedlot, Inc. ("the plaintiff" or "the corporation") was required to pay pursuant to deficiency notices for its fiscal years that ended on August 31, 1976, and on August 31, 1977.

It is concluded that the plaintiff is entitled to recover.

*Background Information*

The plaintiff is a closely held Texas business corporation. It was organized in 1962 by a group of local grain farmers for the purpose of conducting a cattle feedlot in Tulia, Texas. The plaintiff was and is engaged in the business of feeding cattle purchased by it and later resold to packing companies after a fattening program, feeding cattle for other persons under contract, and selling the grain of its shareholders. The principal motivation of the corporation's organizers was to have a better market for their grain.

It was necessary for the corporation to borrow money during the years in question, and also during previous years, for the purchase of cattle, for the purchase of feed, and for operating expenses. The corporation did not have sufficient capital for these purposes without obtaining loans.

Beginning in the middle 1970's and continuing thereafter, including the years in question, the loans were obtained by the corporation from the Production Credit Association of Plainview, Texas ("the PCA"). The corporation's cattle and feed served as the primary collateral for the loans. However, the PCA did not regard the corporation's cattle and feed as adequate security for the loans to the corporation; and the PCA, as a condition precedent to the making of the loans, required that their repayment be personally guaranteed, to the extent of 100 percent of the anticipated indebtedness, by one or more individual guarantors having adequate financial assets to make good on the commitment, if necessary.

Accordingly, continuing guaranties were provided to the PCA by the 11 directors of the corporation for each of the fiscal years 1976 and 1977.[1] The 11 directors were all shareholders in the corporation, and together they owned approximately 98 percent of the corporation's stock. For the fiscal year 1977, an additional shareholder, who was not a director, provided a continuing guar-

1. A twelfth individual who served as a director during September, October, and November of 1975 did not provide a guaranty.

anty to the PCA on behalf of the corporation. Each guaranty was for a specific amount, and the total amount guaranteed by the several guarantors for each year slightly exceeded the total amount of the corporation's indebtedness to the PCA for the particular year.

Near the end of each fiscal year, each guarantor was paid a fee by the corporation for the guaranty which he or she furnished to the PCA on behalf of the corporation. In computing the total amount of the guarantor fees that would be paid in 1976 and 1977, the corporation took 3 percent of the average annual outstanding indebtedness of the corporation to the PCA, and prorated this amount among the guarantors in proportion to the amount which each guarantor personally guaranteed. As a result of the computation, the corporation in 1976 paid guarantor fees in the total amount of $26,140.50, and in 1977 the corporation paid guarantor fees in the total amount of $33,004.10.

In the corporation's income tax returns for its fiscal years 1976 and 1977, the corporation deducted the guarantor fees of $26,140.50 and $33,004.10, respectively, among the other items listed as ordinary and necessary business expenses. On examining the plaintiff's income tax returns for the years mentioned, the Internal Revenue Service disallowed the deductions relating to the guarantor fees, determined that such fees constituted dividends, made adjustments in accordance with this determination, and issued deficiency notices to the plaintiff. The plaintiff thereafter paid the deficiencies, together with interest; filed timely claims for refund; and, upon the disallowance of the claims, instituted the present action.

## Tulia I

For a number of years before the period that is involved in the present litigation, lending institutions had required that loans made to the corporation be personally guaranteed, to the extent of 100 percent of the expected indebtedness, by individuals having the financial ability to make good on such commitments, if necessary. Before July 1970, all the guaranties had been made by shareholders of the corporation without the payment of any fee from the corporation. However, at the regular meeting of the corporation's Board of Directors held on July 14, 1970, the board voted to obtain an additional guaranty of $25,000 from each of the previous guarantors, and to pay each guarantor annually a fee equal to 3 percent of the amount guaranteed by him or her. Accordingly, the corporation in 1970 paid the guarantors, who were the principal shareholders of the corporation, a total of $54,000 as guarantor fees.

The corporation deducted this amount for income tax purposes under section 162(a) of the Internal Revenue Code of 1954 (26 U.S.C. § 162(a)), but the deduction was disallowed by the Internal Revenue Service. The corporation paid the resulting deficiency, plus interest, and then instituted an action in the United States District Court for the Northern District of Texas to recover the total amount paid. The district court found that the guarantor fees were ordinary and necessary business expenses under section 162(a), and that they were reasonable in amount. The Government appealed, and the district court's decision was reversed by the United States Court of Appeals for the Fifth Circuit in the case of *Tulia Feedlot, Inc. v. United States,* 513 F.2d 800 (5th Cir.1975), *cert. denied,* 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281 (1975) ("Tulia I"). The appellate court held (*id.* 513 F.2d at 803–04) that the guarantor fees constituted distributions of property made by the corporation to its shareholders under 26 U.S.C. § 316, and not ordinary and necessary business expenses under section 162(a).

## Tulia II

The present case was transferred to this court from its predecessor, the United States Court of Claims, pursuant to section 403(d) of the Federal Courts Improvement Act of 1982 (Pub.L. 97–164, 97th Cong., 96 Stat. 25, 57–58).

While the case was pending before the Court of Claims, it was considered by that court on the defendant's motion for summary judgment. The defendant contended in support of its motion that the doctrine of collateral estoppel prevented the plaintiff from litigating the present action, because (according to the defendant) the facts in this case are similar to the facts that were involved in the earlier case of *Tulia I,* which was prosecuted by the same plaintiff and was ultimately disposed of adversely to the plaintiff. The plaintiff responded to the defendant's contention before the Court of Claims by asserting that the facts in the present case are significantly different from those in the earlier litigation.

In an order dated September 10, 1982 ("*Tulia II* "), the Court of Claims found that "there are disputed issues of facts that if proven will make this case significantly different from Tulia I." The court's statement concerning disputed issues of fact was based on material submitted by the plaintiff to the effect that each shareholder decided what he or she was willing to guarantee; that such amounts were not in proportion to the shareholders' stockholdings; and that the corporation looked into alternative means of financing, studied the risks, and concluded that having the shareholders guarantee the loans for a fee was the best means of financing the operations of the corporation. The court said that several factors were critical to the Court of Appeals' decision in *Tulia I: i.e.,* the principal shareholders guaranteed loans to the corporation in proportion to their stockholdings; there was no evidence presented to show how the 3 percent figure for guarantor fees was determined; and there was no evidence introduced to show that such guaranties were commonly required of closely held corporations in the cattle feedlot business.

The Court of Claims held in *Tulia II* that the doctrine of collateral estoppel was inapplicable at the time, and denied the defendant's motion for summary judgment without prejudice.

## Discussion

The statutory provision involved in this case is 26 U.S.C. § 162(a) (1976), which states in pertinent part as follows:

§ 162. Trade or business expenses

(a) In general

There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * *.

Whether or not the guarantor fees which the plaintiff paid to its shareholders in 1976 and 1977 constituted ordinary and necessary business expenses is a question of fact, to be decided on the basis of the evidence in this record. *Rubber Associates, Inc. v. Commissioner,* 335 F.2d 75, 78 (6th Cir. 1964).

The evidence adduced at the trial of the case shows that, before any continuing guaranties were provided to the PCA by shareholders of the corporation for the fiscal years 1976 and 1977, the corporation's Board of Directors investigated the possibility of obtaining—and sought for sources of—loans for these fiscal years that would not require individual guaranties. The directors consulted with two banks located in Tulia, Texas, with a bank located in Plainview, Texas, and with the PCA, concerning the willingness of these institutions to make loans to the corporation without requiring that the loans be personally guaranteed by individuals. Each of these institutions informed the directors that no loan would be made to the corporation unless it was personally guaranteed in full by individuals having adequate financial resources to make good on the commitments, if necessary. Also, the board investigated the possibility of obtaining, and were unable to obtain, individual guarantors other than shareholders of the corporation who would be willing and financially able to guarantee the corporation's loans from the PCA.

It was a matter of necessity, therefore, for shareholders of the corporation to provide personal guaranties, up to a total of 100 percent of the expected indebtedness, in order for the corporation to obtain the nec-

essary loans from the PCA. This was the only feasible means available to the corporation of obtaining the loans that were essential for operating expenses.

In order to meet the PCA's requirement for personal guaranties, the corporation's Board of Directors held a meeting, and each director was asked to indicate on a slip of paper how much (if any) of the total guaranty demanded by the PCA he or she was willing and financially able to guarantee. The slips of paper were then collected and totaled. As the total amount of the initial submissions was inadequate, the directors were asked whether they were willing to increase the amounts of their respective guaranties, with the result that the total amount required by the PCA was obtained.

The 11 directors owned equal amounts of the corporation's stock. Although eight of the directors provided guaranties that were equal in amount, $200,000 each, two of the directors guaranteed only $50,000 each, and the other director provided a guaranty of $150,000. The guarantor fees were based on the amounts of the guaranties, and not on the amounts of stock owned by the guarantors. This discredits the defendant's argument that the guarantor fees were really dividends in disguise.

The evidence also shows that it was not possible for other corporate owners of cattle feedlots in the Tulia area to obtain loans for operating expenses without having the loans personally guaranteed, to the extent of 100 percent, by shareholders with financial means sufficient to make good on their commitments, if necessary. In connection with obtaining personal guaranties from shareholders, it was customary for the corporate owners to pay guarantor fees of from 3 to 5 percent to shareholders guaranteeing the loans.

In the present case, the evidence further shows that the corporation's guarantors were unwilling to provide the required guaranties unless they received guarantor fees of 3 percent, and this was agreed to by the corporation.

In computing the total amount of the guarantor fees that would be paid in 1976 and 1977, the corporation took 3 percent of the average annual outstanding indebtedness of the corporation to the PCA, and prorated this amount among the guarantors in proportion to the amount which each guarantor personally guaranteed. On this basis, total guarantor fees of $26,140.50 and $33,004.10, respectively, were paid by the corporation in 1976 and 1977.

On the basis of the evidence in this record, it is concluded and found that the guarantor fees which the corporation paid to shareholders for its fiscal years 1976 and 1977 were ordinary in the sense that they were of a known type and commonly made by persons in the type of business carried on by the corporation and were the accepted means utilized by such persons to obtain financing for their operations (see Welch v. Helvering, 290 U.S. 111, 114, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933)); that they were necessary in the sense that they were appropriate and helpful for the development of the corporation's business (id. at 113, 54 S.Ct. at 8–9); and that they were reasonable in amount (see Tulia I, supra, 513 F.2d at 804).

These conclusional findings are made despite the necessity of subjecting transactions between a corporation and its shareholders to special scrutiny (see Dillin v. United States, 433 F.2d 1097, 1103 (5th Cir. 1970)), and the circumstance that the corporation did not distribute any dividends to its shareholders for the fiscal years 1976 and 1977.

It necessarily follows that the plaintiff was entitled to deduct the 1976 and 1977 guarantor fees as ordinary and necessary business expenses for income tax purposes.

## CONCLUSION OF LAW

On the basis of the foregoing opinion and the facts found by the court, as stated in the findings of fact and in the opinion, the court concludes as a matter of law and determines that the plaintiff is entitled to recover, together with interest according to law.

The amount of the recovery will be determined in subsequent proceedings under Rule 42(c).

IT IS SO ORDERED.

## FINDINGS OF FACT

1. This is an action for the recovery of federal income taxes and interest in the total amount of $36,059.88 (plus statutory interest) which Tulia Feedlot, Inc. ("the plaintiff" or "the corporation") paid for its respective fiscal years that ended on August 31, 1976, and on August 31, 1977.

2. Jurisdiction is proper, pursuant to section 1491 of title 28 of the United States Code and sections 6532 and 7422 of the Internal Revenue Code of 1954 (26 U.S.C. §§ 6532 and 7422).

3. The plaintiff is a closely held Texas business corporation, which was organized in 1962 by a group of local grain farmers for the purpose of conducting a cattle feedlot in Tulia, Texas. The plaintiff was and is engaged in the business of feeding cattle which it purchases and later resells to packing companies after a fattening program, feeding cattle for other persons under contract, and selling the grain of its shareholders. The principal motivation of the corporation's organizers was to have a better market for their grain.

4. (a) It was necessary for the corporation to borrow money during the years in question, and also during previous years, for the purchase of cattle, for the purchase of feed, and for operating expenses. The corporation did not have sufficient capital for these purposes without obtaining loans.

(b) Beginning in the middle 1970's and continuing thereafter, including the years in question, the loans were obtained by the corporation from the Production Credit Association ("the PCA") of Plainview, Texas. In earlier years, loans were obtained by the corporation from the First National Bank of Tulia, Texas.

5. The corporation's cattle and feed served as the primary collateral for the loans. However, the PCA did not regard the corporation's cattle and feed as adequate security for the loans to the corporation; and the PCA, as a condition precedent to the making of the loans, required that their repayment be personally guaranteed, to the extent of 100 percent of the anticipated indebtedness, by one or more individuals having the financial means to discharge the obligation, if necessary. Accordingly, continuing guaranties were provided to the PCA by the 11 directors of the corporation for the years 1976 and 1977, all 11 of the directors being shareholders, and a continuing guaranty was provided by an additional shareholder for 1977. Each guaranty was for a specific amount, and the total amount guaranteed by the several guarantors for each year slightly exceeded the total amount of the corporation's indebtedness to the PCA for the particular year.

6. (a) Before any continuing guaranties were provided to the PCA by shareholders of the corporation for the fiscal years 1976 and 1977, the Board of Directors of the corporation investigated the possibility of obtaining—and sought for sources of—funds for the fiscal years 1976 and 1977 that would not require individual guaranties. The directors consulted with two banks located in Tulia, Texas, and a bank located in Plainview, Texas, and with the PCA, concerning the willingness of these institutions to make loans to the corporation without requiring that the loans be personally guaranteed by individuals. Each of these institutions informed the directors that no loan would be made to the corporation unless it was guaranteed in full by individuals having adequate financial resources to make good on the commitments, if necessary.

(b) The evidence in the record warrants the inference, and it is found, that the lending institutions, including the PCA, did not require guaranties from any specific individuals or number of individuals, but, rather, required that the full amount of any loan be personally guaranteed by whatever individuals were willing to provide the guaranties and were financially able to make good on the commitments, if necessary.

(c) Before any continuing guaranties were provided by shareholders of the corporation for the fiscal years 1976 and 1977, the board investigated the possibility of obtaining, and were unable to obtain, guarantors other than shareholders of the corporation who would be willing and financially able to guarantee the corporation's loans from the PCA.

(d) It was necessary, therefore, for shareholders of the corporation to provide the necessary guaranties in order for the corporation to obtain the necessary loans from the PCA. This was the only feasible means available to the corporation of obtaining the loans that were essential for operating expenses.

7. (a) In order to meet the PCA's requirement for personal guaranties, the corporation's Board of Directors held a meeting and each director was asked to indicate on a slip of paper how much (if any) of the total guaranty he or she was willing and financially able to guarantee. The slips of paper were collected and totaled; and as the total amount on the initial submissions was inadequate, directors were asked whether they were willing to increase the amounts of their respective guaranties, with the result that the total amount required by the PCA was obtained.

(b) The guarantors were unwilling to provide the guaranties unless they were compensated at the rate of 3 percent.

8. (a) Near the end of each fiscal year, each guarantor was paid a fee by the corporation for the guaranty which he or she furnished to the PCA on behalf of the corporation. In computing the amount of the guarantor fees that would be paid in 1976 and 1977, the corporation took 3 percent of the average annual outstanding indebtedness of the corporation to the PCA, and this amount was prorated among the guarantors in proportion to the amount which each guarantor personally guaranteed.

(b) The computation of the total amount to be paid for each of the pertinent fiscal years as guarantor fees is shown in the following table:

| Year | Per Cent | | Average Out-standing Balance | | Total Fee Paid |
| --- | --- | --- | --- | --- | --- |
| August 31, 1976 | 3 | x | $ 871,350 | = | $26,140.50 |
| August 31, 1977 | 3 | x | $1,100,136 | = | $33,004.08 |

9. (a) During the two fiscal years involved in the action, approximately 98 percent of the stock of the corporation was owned by the following individuals:

H.T. Copeland

A.H. Jennings

Henry Boston

Robert N. Allen

Edwin E. Adams and Avory Adams (owned jointly with right of survivorship)

Roy Stockett

Lucille Brasher

Morgan Sturgess

C.B. Martin, Jr.

Otis Harman

E.M. Kee

(b) Approximately 2 percent of the stock was owned by the following employees of the corporation during the pertinent fiscal years:

J. Mark Martin

Doyal Gore

J.L. McGowen

Carroll N. Welch

C. Doug Martin

(c) Harvey Miller was also a shareholder of the corporation for the period from September 1, 1975, until approximately December 1, 1975.

10. (a) The corporation's board of directors was comprised of the following individuals on the dates indicated:

(1) August 31, 1976 (fiscal year end): Morgan Sturgess

Roy Stockett
Edwin Adams
H.T. Copeland
C.B. Martin, Jr.
Otis Harman
A.H. Jennings
Robert N. Allen
Lucille Brasher
E.M. Kee, Jr.
Henry Boston

(2) August 31, 1977 (fiscal year end):
Morgan Sturgess
Roy Stockett
Edwin Adams
H.T. Copeland
C.B. Martin, Jr.

Otis Harman
Myrtle Jennings
Robert N. Allen
Lucille Brasher
E.M. Kee, Jr.
Henry Boston

(b) Harvey Milner was also a director during the period from September 1, 1975, until December 1, 1975.

11. Guarantor fees of $26,140.50 and $33,004.10 were paid by the corporation for the respective fiscal years 1976 and 1977.

12. The following is a schedule of the guarantor fees paid to shareholders providing guaranties for the years in question:

| Shareholder | Total Each Guaranteed | Percent of total Guaranty | Fees Paid 1976 | 1977 |
|---|---|---|---|---|
| E. M. Kee, Jr. | $200,000.00 | 10.812 | $2,826.00 | $3,568.40 |
| H. T. Copeland | 200,000.00 | 10.812 | 2,826.00 | 3,568.40 |
| Robert N. Allen | 50,000.00 | 2.703 | 706.50 | 892.10 |
| Morgan Sturgess | 200,000.00 | 10.812 | 2,826.00 | 3,568.40 |
| Roy Stockett | 200,000.00 | 10.812 | 2,826.00 | 3,568.40 |
| A. H. Jennings | 200,000.00 | 10.812 | 2,826.00 | 3,568.40 |
| Henry Boston | 50,000.00 | 2.703 | 706.50 | 892.10 |
| L. Brasher | 150,000.00 | 8.109 | 2,119.50 | 2,676.30 |
| C. B. Martin, Jr. | 200,000.00 | 10.812 | 2,826.00 | 3,568.40 |
| Edwin Adams | 100,000.00 | 5.400 | 2,826.00 | 1,782.40 |
| Avory Adams | 100,000.00 | 5.400 | – 0 – | 1,782.40 |
| Otis Harman | 200,000.00 | 10.812 | 2,826.00 | 3,568.40 |
| Totals | $1,850,000.00 | | $26,140.50 | $33,004.10 |

13. For the 2 fiscal years involved in the action, shareholder-directors guaranteed loans in relation to their shareholdings in the following percentages:

| Name of Shareholder-Director | Percentage of Stock Owned | Percentage of Total Amount Guaranteed |
|---|---|---|
| Morgan Sturgess | 8.886 | 10.812 |
| Roy Stockett | 8.886 | 10.812 |
| Edwin Adams (Avory Adams) | 8.886 | 10.812 |
| H. T. Copeland | 8.886 | 10.812 |
| C. B. Martin, Jr. | 8.886 | 10.812 |
| Otis Harman | 8.886 | 10.812 |
| A. H. Jennings (Myrtle Jennings) | 8.886 | 10.812 |
| E. M. Kee, Jr. | 8.886 | 10.812 |
| Lucille Brasher | 8.886 | 8.109 |
| Henry Boston | 8.886 | 2.703 |
| Robert N. Allen | 8.886 | 2.703 |

14. The following individuals were paid guarantor fees one month before the fiscal year's end, as indicated:

H. T. Copeland
Director – 1976 & 1977 fiscal
years
Guarantor fees paid:
July 23, 1976 – $2,826.00
July 25, 1977 – $3,568.40

A. H. Jennings
Director – 1976 & 1977
Guarantor fees paid:
July 23, 1976 – $2,826.00
July 25, 1977 – $3,568.46

Henry Boston
Director – 1976 & 1977 fiscal
years
Guarantor fees paid:
July 23, 1976 – $706.50
July 25, 1977 – $892.10

Robert N. Allen
Director/Executive Vice-
President, Manager – 1976
& 1977 fiscal years
Guarantor fees paid:
July 23, 1976 – $706.50
July 25, 1977 – $892.10

Edwin E. Adams
Son of Avory Adams
Director – 1976 & 1977 fiscal
years
Guarantor fees paid:
July 23, 1976 – $2,826.00
July 25, 1977 – $1,782.40

Avory Adams, deceased
Father of Edwin Adams
No office held
Guarantor fees paid:
July 23, 1976 – 0
July 25, 1977 – $1,782.40

Roy Stockett
Director/Secretary &
Treasurer during 1976 &
1977 fiscal years
Guarantor fees paid:
July 23, 1976 – $2,826.00
July 25, 1977 – $3,568.40

Lucille Brasher
Director – 1976 & 1977
fiscal years
Guarantor fees paid:
July 23, 1976 – $2,119.50
July 25, 1977 – $2,676.30

Morgan Sturgess
Director – 1976 & 1977
fiscal years
Guarantor fees paid:
July 23, 1976 – $2,826.00
July 25, 1977 – $3,568.40

C. B. Martin, Jr.
Director – 1976 & 1977
fiscal years
Guarantor fees paid:
July 23, 1976 – $2,826.00
July 25, 1977 – $3,568.40

Otis Harman
Director/Vice President –
1976 & 1977 fiscal years
Guarantor fees paid:
July 23, 1976 – $2,826.00
July 25, 1977 – $3,568.40

E. M. Kee
Director – 1976 & 1977
fiscal years
Guarantor fees paid:
July 23, 1976 – $2,826.00
July 25, 1977 – $3,568.40

15. For a number of years before the period that is involved in the present litigation, lending institutions had required that loans made to the corporation be guaranteed personally by individuals having the financial ability to make good on such commitments, if necessary. The required guaranties were provided by shareholders of the corporation.

16. No shareholder of the corporation has ever been held liable upon any guaranty signed by him or her on behalf of the corporation.

17. Before July 1970, all the guaranties had been made by shareholders without the payment of any fee from the corporation. However, at the regular meeting of the corporation's Board of Directors held on July 14, 1970, the board voted to obtain an additional guaranty of $25,000 from each of the previous guarantors and to pay each guarantor annually a fee equal to 3 percent of the amount guaranteed by him or her. Accordingly, the corporation paid the principal shareholders a total of $54,000, or $4,500 each, in 1970 as guarantor fees. The corporation's deduction of this amount under section 162 was disallowed by the Internal Revenue Service; and the disallowance was upheld by the Fifth Circuit in *Tulia*

*Feedlot, Inc. v. United States,* 513 F.2d 800 (5th Cir.1975), *cert. denied,* 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281 (1975).

18. The corporation did not pay any dividends until 1972. After paying a dividend for the fiscal year 1972, the corporation did not pay any dividends thereafter for the tax years 1973 through 1977, including the period that is involved in the present litigation.

19. (a) The corporation customarily paid a director's fee each year to the members of its Board of Directors, who are virtually the only shareholders in the corporation.

(b) During the fiscal years 1976 and 1977, directors' fees totaling $40,200 and $39,600, respectively, were paid by the corporation. Each director was paid a director's fee of $300 per month during those years.

(c) The amounts paid as directors' fees for the fiscal years 1976 and 1977 were deducted by the plaintiff, for income tax purposes, as ordinary and necessary business expenses. These deductions were not challenged by the Internal Revenue Service.

20. The shareholders in the plaintiff corporation, and shareholders in similar corporate feedlots located in the same geographical area, entered upon these enterprises as long-term investments, and not with the expectation or desire of obtaining a cash flow.

21. (a) It was not possible for the plaintiff, or for other corporate owners of cattle feedlots in the Tulia area, to obtain loans for operating capital without having the loans personally guaranteed to the extent of 100 percent by shareholders with financial means sufficient to make good on their commitments, if necessary.

(b) It was customary for corporate owners of feedlots in the Tulia area to pay guarantor fees of from 3 to 5 percent to shareholders guaranteeing their loans.

22. (a) The plaintiff's income tax return for the fiscal year which began on September 1, 1975, and ended on August 31, 1976, showed total taxable income of $155,742.62, after deducting guarantor fees of $26,140.50 among other items listed as ordinary and necessary business expenses, and showed the total tax due as being $18,128.23.

(b) The plaintiff's income tax return for the fiscal year which began on September 1, 1976, and ended on August 31, 1977, showed total taxable income of $101,600.89, after deducting guarantor fees of $33,004.10 among other items listed as ordinary and necessary business expenses, and showed the total tax due as being $25,375.98.

(c) On examining the plaintiff's income tax returns mentioned in paragraphs (a) and (b) of this finding, the Internal Revenue Service disagreed with the plaintiff's treatment of guarantor fees as ordinary and necessary business expenses. Instead, the IRS determined that the guarantor fees constituted dividends, made adjustments in accordance with this determination, and issued deficiency notices to the plaintiff.

(d) The plaintiff paid the deficiencies (together with the interest); filed timely claims for refund; and, upon the disallowance of the claims, instituted the present action.

23. (a) The guarantor fees which the corporation paid to shareholders in 1976 and 1977 were reasonable in amount.

(b) Such payments were of a known type and commonly made by persons in the type of business carried on by the corporation and were the accepted means utilized by such persons to obtain financing for their operations.

(c) Such payments were appropriate and helpful for the development of the corporation's business.

(d) Such payments constituted ordinary and necessary business expenses paid in carrying on a trade or business.