**SEMINOLE THRIFTWAY, INC.**

v.

**The UNITED STATES.**

No. 97–121T.

United States Court of Federal Claims.

Dec. 21, 1998.

Scotty A. Holloman, Hobbs, NM, attorney of record for the plaintiff.

Sheryl B. Flum, Washington, D.C., with whom was Assistant Attorney General Loretta C. Argrett, for the defendant.

## OPINION

YOCK, Judge.

This case comes before the Court on the defendant's Motion for Summary Judgment

pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). The plaintiff contends that Internal Revenue Code ("I.R.C.") § 162(a), 26 U.S.C. § 162(a) (1994), permits the plaintiff to deduct as "ordinary and necessary business expenditures" guarantor fees it paid to its shareholders for acting as the plaintiff's guarantors in a financing arrangement. The defendant counters that because the plaintiff had no obligation to pay the guarantor fees to the shareholders, section 162(a) does not permit the plaintiff to take a deduction. Instead, because the plaintiff could have but failed to declare a dividend, and because of the nature of the payments, the defendant likens the payments of the guarantor fees to constructive dividends. Based on the Court's review of the parties' briefs and submissions, the Court concludes that the Government prevails as a matter of law. For the reasons set forth below, the defendant's Motion for Summary Judgment is granted.[1]

### Factual Background

This case involves the plaintiff's claims for income tax refunds for the 1992, 1993, and 1994 tax years. On March 10, 1983, Messrs. Dale Carter, Jess Claiborne, and Dennis Porter, Jr., formed plaintiff Seminole Thriftway, Inc. ("Thriftway"). Each shareholder contributed $10,000 and loans of $50,000 to Thriftway's capital. Thriftway issued to each shareholder a third of its authorized 1,000 shares of common stock.

Thriftway owns and operates a supermarket in Seminole, Texas. Soon after incorporation, Thriftway required more capital in order to purchase the necessary land and to pay for the construction and stocking of the store. Thriftway sought out several forms of financing other than taking more capital from its shareholders. On July 6, 1983, Thriftway obtained $1 million in financing from Seminole's Industrial Corporation Industrial Revenue Bonds (Seminole Thriftway, Inc. Project) Series 1983 ("Bonds"). The Bonds had a 15–year term and were due to mature on July 15, 1998. The Bonds had an annual interest rate equal to the lesser of 80 percent of RepublicBank Dallas' "prime interest rate," or 15 percent.

However, Thriftway needed additional third-party help on this financing arrangement because the holders of the Bonds would not have accepted the Bonds without some additional guarantees for their investment. Therefore, as part of the arrangement, Thriftway and the three controlling shareholders executed a guaranty agreement whereby the three shareholders absolutely and unconditionally guaranteed the punctual payment of principal and interest due on the Bonds. The guaranty was irrevocable until all the holders of the Bonds were paid in full with funds not subject to recission or repayment. Although both the plaintiff and the defendant agree that the shareholders guaranteed the Bonds in order to finance the project, to save interest and other costs, and to enhance the marketability of the Bonds, the plaintiff adds that "it was * * * mandatory for them to guarantee the bonds to obtain financing * * *." (Pl.'s Statement of Genuine Issues at ¶ 10.)

Prior to Thriftway's decision to pay its shareholders for acting as guarantors, the makeup of the shareholders changed. First, on November 1, 1985, Thriftway hired Mr. John Kildow as general manager of the Seminole store. At this time, each of the three shareholders transferred 70 shares of Thriftway common stock to Mr. Kildow. Thus, Mr. Kildow owned 210 shares and each controlling shareholder owned 263 and ⅓ shares. Second, on October 28, 1987, Mr. Dennis Porter, Jr., transferred all of his shares to his wife, Mrs. Cynthia Porter, because he was a bank director and thought a transfer would more prudently protect their mutual assets.

Three days later, on November 1, 1987, Messrs. Porter, Carter, and Claiborne were elected to serve as Thriftway's directors for a one-year term. Then, just before the new year, Thriftway, by action of its directors, authorized payments of guarantor fees of 8 percent of the total outstanding indebtedness

---

1. Although the defendant has requested oral argument in this matter, the Court deems oral argument on these issues unnecessary.

for 1987 and 10 percent of the total outstanding indebtedness for each year beginning in 1988. The parties agree that Thriftway paid the fees as compensation for the risk the controlling shareholders undertook when they agreed to guarantee the Bonds. The plaintiff also maintains that the fees were "to assure that [the controlling shareholders'] personal guarantees would be available in the future * * *." (Pl.'s Statement of Genuine Issues at ¶ 16.)

During the 1992, 1993, and 1994 tax years, Thriftway did not pay out either dividends to its shareholders or director's fees. It deducted $70,231 for guarantor fees for 1992, $35,866 for guarantor fees for 1993, and $29,-199 for guarantor fees for 1994. In addition, the record reflects that despite Thriftway's reporting of a net operating loss for 1992 related to its losing investment in Stamford Thriftway, Inc., Thriftway was profitable for each of these tax years. The Internal Revenue Service ("IRS") disallowed the deductions, and Thriftway paid the resulting tax liability on September 16, 1996. At the same time, the plaintiff also filed a claim with the IRS for a refund for each of the deduction amounts. The IRS disallowed the claims on November 20, 1996. Thereafter, on February 25, 1997, Thriftway filed its current Complaint with this Court seeking a tax refund.

### *Discussion*

The Court will grant summary judgment when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the Court will construe all facts in a light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Since there are no genuine issues of material fact outstanding for the purposes of this motion, this Court has the power to decide this matter.

In a tax refund case, the Commissioner of Internal Revenue's ruling carries a presumption of correctness. *See United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Danville Plywood Corp. v. United States*, 899 F.2d 3, 7 (Fed.Cir.1990); *Whiteside v. United States*, 26 Cl.Ct. 564, 566 (1992). The taxpayer has the burden of proving by a preponderance of the evidence that the Commissioner's determination is wrong. *See Helvering v. Taylor*, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Mulholland v. United States*, 28 Fed. Cl. 320, 339 (1993).

### A. The Ordinary and Necessary Standard Under Section 162(a)

#### 1. Defining the hard-headed businessman test

It is plain that "a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms." *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934). In this case, the relevant statutory framework begins with I.R.C. § 162(a), which provides "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." For any item to qualify for a deduction under section 162(a), it "must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." *Commissioner v. Lincoln Sav. & Loan Ass'n.*, 403 U.S. 345, 352, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971).

A business expense is ordinary if the expense relates to a transaction "of common or frequent occurrence in the type of business involved." *Deputy v. du Pont*, 308 U.S. 488, 495, 60 S.Ct. 363, 84 L.Ed. 416 (1940). An ordinary expense must also be currently deductible; it cannot be a capital expenditure, which must to the extent it can be deductible be amortized over the useful life of the asset. *See Commissioner v. Tellier*, 383 U.S. 687, 689–90, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966). The term "ordinary"

also demands that the expenditure is of a reasonable amount. *See Tulia Feedlot, Inc. v. United States*, 513 F.2d 800, 804 (5th Cir.1975) (*"Tulia I"*) (citing *Limericks, Inc. v. Commissioner*, 165 F.2d 483, 484 (5th Cir. 1948)).

■ An item is necessary if appropriate and helpful in the development and maintenance of a taxpayer's business. *See Welch v. Helvering*, 290 U.S. 111, 113, 54 S.Ct. 8, 78 L.Ed. 212 (1933). The item does not have to be "necessary" in the sense that without the expense the business could not survive. Such a strict definition would require courts to scrutinize closely the individual business decisions made by a taxpayer, and perhaps to solicit hordes of efficiency experts to determine whether in each case the taxpayer had no other option but to use the means chosen. Instead, the court will analyze whether a "hard-headed businessman, under the circumstances, would have incurred the expense." *Tulia I*, 513 F.2d at 804; *see also Cole v. Commissioner*, 481 F.2d 872, 876 (2d Cir.1973) (applying hard-headed businessman test in a nonguarantor fee setting).

This standard has its limits and impracticalities. Judicial deference is given to business practices, not to tax avoidance schemes. Also, the value of the hard-headed businessman standard decreases with the existence of special relationships that can occur between contracting parties, as in the case of a close corporation. *See Tulia I*, 513 F.2d at 805. The mesh of motivations of a director issuing cash to himself as a director requires more aid to unravel than a necessarily vague business judgment rule. When the issue is whether or not guarantor fees paid by closely-held corporations to their shareholders qualify for a deduction under section 162, other courts, including the United States Claims Court, have focused on several factors to determine the necessity of the payments.

### 2. The guarantor fee cases

In *Tulia I*, a cattle feed cooperative provided feed for cattle owned by its customers. The cooperative required large amounts of credit in order to keep its pens full when regular customers generated insufficient

business. *See id.* at 803. From 1964 to 1970, the principal shareholders would guarantee loans to the corporation in proportion to their stock holdings without receiving compensation. In 1970, the cooperative began paying fees to the guarantors. Tulia, a profitable corporation, did not declare a dividend until 1972. *See id.*

The Fifth Circuit held that Tulia's guarantor fees were not ordinary and necessary business expenses but instead were distributions of property (*i.e.*, constructive dividends) payments to shareholders pursuant to I.R.C. § 316. *See id.* at 803–04; *infra*. The court denied the deduction because Tulia failed to demonstrate that the cattle feedlot industry businesses customarily paid shareholders a guarantor fee. *See id.* at 805–06. Without such evidence, the court "could not be sufficiently informed as to the economic realities of the transaction." *Id.* at 806. In addition, Tulia had failed to provide any evidence that the amount of the fees was reasonable. *See id.*

In *Olton Feed Yard, Inc. v. United States*, 592 F.2d 272 (5th Cir.1979), the Fifth Circuit analyzed another feedlot case. In 1973, Olton obtained a line of credit that required the shareholders to guarantee the debt in proportion to their stock ownership. Olton later explained to the shareholders that it would pay them an as-then-undetermined reasonable fee to compensate the shareholders. However, the shareholders received no written evidence of this agreement. One year later, Olton's board of directors approved the payment of guarantor fees. *See id.* at 274. Like Tulia, Olton did not pay any other dividends, and Olton maintained profits for the relevant years. *See id.* at 275.

The Fifth Circuit determined that it was not necessary for Olton to pay the shareholders a fee to induce them to sign guarantees for the loan. *See id.* at 275–76. The court noted that Olton was profitable and did not pay out dividends. *See id.* at 275. Olton did not present evidence establishing that industry businesses customarily paid guarantor fees to their shareholders, and the court noted that the absence of such custom would disallow the deduction. *See id.* at 276. The

court also pointed out that the shareholders agreed to the guarantee without knowing when or how much they would receive in exchange. *See id.* at 276. Olton waited until it had substantial taxable income before agreeing to pay guarantor fees, and the Fifth Circuit held that, under the circumstances, the jury permissibly found that the fees were constructive dividends. *See id.*

Four years later, the United States Claims Court heard *Tulia Feedlot, Inc. v. United States,* 3 Cl.Ct. 364 (1983) ("*Tulia III* ").[2] At this time in the corporation's history, Tulia based its guarantor fees on the amount of the guarantee given by each shareholder and not on their percentage of stock ownership. *See id.* at 367. The Court found that in 1983 corporations customarily paid out three to five percent guarantor fees to shareholder-guarantors. The Court also determined that Tulia had tried unsuccessfully to obtain loans that would not involve their shareholders as the guarantors and that the shareholders were unwilling to provide guarantees unless they received specified fees. *See id.* As a result, finding the fees ordinary and necessary, and reasonable, the Court held for the plaintiff in *Tulia III. See id.*

In *Fong v. Commissioner,* 48 T.C.M. (CCH) 689, 1984 WL 15052 (1984), the petitioners were in the grocery business. The United States Tax Court determined that the guarantor fees paid by the closely-held corporation to its principal shareholder did not meet the requirements of the ordinary and necessary business expenses definition under section 162(a). It found that the petitioners did not show sufficient evidence of grocery store custom with respect to the payment of guarantor fees, or even evidence that the payment of the fees was historically normal for the corporation's own operations. *See id.* at 713–14. The Tax Court also relied on the fact that the principal shareholder personally guaranteed corporate loans for 10 years without requiring or receiving compensation. *See id.* at 714.

These cases provide a valuable legal framework for defining when payments of guarantor fees made to shareholders should be considered ordinary and necessary and when those same payments should be considered as constructive dividend transactions. The framework includes several factors. First, the fees must be reasonable. *See Tulia I,* 513 F.2d at 804; *Tulia III,* 3 Cl.Ct. at 367.

Second, businesses of the same type and size as the payor corporation must customarily pay guarantor fees to their shareholders. *See Tulia I,* 513 F.2d at 806; *Fong,* 48 T.C.M. (CCH) at 713. Absence of custom will destroy deductibility, but its presence will not ensure deductibility. *See Tulia I,* 513 F.2d at 806. The existence of custom suggests the ordinariness of the business expense because custom demonstrates the accepted practice of similarly-situated corporations.

Third, shareholders must demand compensation in exchange for signing on as guarantors. If the shareholders had provided the guarantees without compensation, then the payment of guarantor fees is gratuitous, and the courts will not label such a transaction as "necessary." *See Olton Feed Yard,* 592 F.2d at 275; *Fong,* 48 T.C.M. (CCH) at 714.

Fourth, the payment of guarantor fees suggests a constructive dividend if the corporation's profitability enabled it to pay a dividend, and yet no dividends were paid out during the relevant tax year. *See Olton Feed Yard,* 592 F.2d at 275; *Tulia I,* 513 F.2d at 803–04. Here, the IRS and the courts are concerned that the corporation has made a distribution of property without the tax consequences of a dividend.

Fifth, the courts give consideration to the proportional relationship between the amount of the payments and the shareholders' stock ownership. *See Tulia III,* 3 Cl.Ct. at 367. The rationale here is that disproportionate distributions discredit the argument

---

**2.** In *Tulia Feedlot, Inc. v. United States,* 231 Ct.Cl. 971 (1982) ("*Tulia II* "), the United States Court of Claims denied the defendant's motion to dismiss on the grounds of collateral estoppel.

The court held that there were disputed facts that made this case significantly different from *Tulia I. See id.* at 973.

that the corporation has used guarantor fees to disguise dividends. Disproportion suggests that the payments are unrelated to stock ownership, and perhaps more akin to ordinary and necessary business expenses. *See id.* As a corollary, proportional payments will weigh against taxpayers seeking to deduct shareholder-guarantor fees. *See Olton Feed Yard,* 592 F.2d at 276.

One of the key lessons derived from these cases is that a guarantor fee transaction that does not fit the definition of an ordinary and necessary business expense will likely be used by a close corporation to distribute dividend-like profits to its shareholders. The Court will closely scrutinize payments made by close-corporations where shareholders also act as directors. *See Charles McCandless Tile Serv. v. United States,* 191 Ct.Cl. 108, 114, 422 F.2d 1336 (1970). The express intent of the closely-held corporation receives less weight than the intent of a publicly-held corporation in similar circumstances, *see Tulia I,* 513 F.2d at 805, because these closely-held corporations are operated by their shareholders, who often take on the management roles of officer and director in order to serve their shareholder interest. *See United States v. Smith,* 418 F.2d 589, 593–94 (5th Cir.1969). This scrutiny uncovers transactions where corporations distribute profits to their shareholders under the guise of a form other than dividends. A dividend is defined by I.R.C. § 316, 26 U.S.C. § 316 (1994), as

> any distribution of property made by a corporation to its shareholders—
>
> (1) out of its earnings and profits accumulated after February 28, 1913, or
>
> (2) out of its earnings and profits of the taxable year * * *.
>
> * * * To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

■ I.R.C. § 301, 26 U.S.C. § 301 (1994), states in pertinent part that distributions of property made by a corporation to its shareholder shall be treated in accordance with section 301(c). This section provides that dividend distributions as defined by section 316(a) shall be included in the shareholders' gross income. A corporate taxpayer may not normally deduct those dividends. *See Hillsboro Nat'l Bank v. Commissioner,* 460 U.S. 370, 393, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983). It will ordinarily pay taxes on them instead.

Thus, in a constructive dividend transaction, the corporation attempts to avoid the tax consequences of nondeductible dividends. Proportionality and dividend history matter in the ordinary and necessary test because they tend to show the true nature of the transaction as a dividend payout, and federal tax law relies on the substance of a transaction, not the form. *See generally Holiday Village Shopping Ctr. v. United States,* 773 F.2d 276, 280 (Fed.Cir.1985) (stating "[c]ourts * * * will focus on the substance rather than on the form of a transaction where necessary to reflect the economic realities of the situation."). The analysis of the factors described above leads this Court to conclude that the guarantor fees at issue here were not ordinary and necessary expenses but were, in fact, constructive dividends.

### B. Analysis of the Factors

#### 1. Disposing with the custom and reasonableness factors

■ For the purposes of this Motion for Summary Judgment, the Court infers that the plaintiff paid out reasonable fees and that the plaintiff's type of business customarily pays guarantor fees. The Government states with respect to custom that "[w]hether such fees are customary in plaintiff's type of business (*i.e.,* the grocery business) is a disputed factual issue as to which summary judgment is not appropriate." (Def.'s Mot. for Summ. J. at 13, n. 10.) The Government also assumes as true, for the purposes of this motion, that the plaintiff paid reasonable fees to the shareholders in the tax years of 1992, 1993, and 1994. "Whether guarantor fees of 10% of plaintiff's outstanding indebtedness were reasonable expenses * * * is a disputed factual issue as to which summary judgment is not appropriate." (Def.'s Mot. for Summ. J. at 13, n. 14.) Therefore, the remaining

issues in dispute in determining the nature of the guarantor fees are: first, the necessity of compensation to induce the shareholders to act as guarantors; second, the proportionality of fees to stock ownership; and third, the corporation's profitability and dividend history.

### 2. Guarantees without promises of compensation

Previous courts have indicated that shareholders must demand compensation in exchange for the guarantees in order to satisfy section 162(a)'s ordinary and necessary standard. If the shareholders had, in the past, provided the guarantees without compensation, there can be no necessity for paying the guarantor fees. *See Olton Feed Yard,* 592 F.2d at 275; *Tulia III,* 3 Cl.Ct. at 367; *Fong,* 48 T.C.M. (CCH) at 714. The plaintiff relies on two separate theories to show that the fees were necessary.

### a. Fees for past consideration

First, the plaintiff claims, and the Court accepts this claim as true for the purposes of defendant's motion, that but for the personal guarantees of the shareholders, the plaintiff would have been unable to obtain financing. (Pl.'s Br. at 11.) The plaintiff analogizes its case to *A.A. and E.B. Jones Co. v. Commissioner,* 19 T.C.M. (CCH) 1561, 1960 WL 1012 (1960), where a corporation not strong enough financially to obtain security bonds on its own required the guarantees of its shareholders in order to improve its business. The court in that case permitted the deduction. *See A.A. and E.B. Jones,* 19 T.C.M. (CCH) at 1563. As the plaintiff states,

> The Bonds were necessary to buy land, construct a building and buy inventory. Without the financing provided by the Bonds, Plaintiff would not have had the

necessary capital to be in business. It was "appropriate and helpful" to pay the guarantor fees to compensate the guarantors for the risk incurred in guarantying the Bonds.

(Pl.'s Br. at 10.) As an example of this risk, the plaintiff points to the failure of the Stamford Thriftway, an asset of the plaintiff's.

However, the plaintiff's logic skips a step. The plaintiff contends that because the financing was necessary, and because the low-cost financing[3] required the guarantees, the fees must therefore be necessary as well. However, the defendant correctly points out that whether or not the guarantees were necessary has no bearing on this matter. (Def.'s Reply at 3, 4.) By the time the plaintiff had paid the fees, the plaintiff had already obtained the Bonds and the guarantees, and the shareholders had assumed the risk of guaranteeing the Bonds. The decision of the plaintiff to grant or not to grant the fees some four or five years later would not obviate the financing or the shareholder's risk.[4] Thus, it does not follow that because the financing was necessary, and because the guarantees were necessary to achieve the financing, the fees were necessary to get the guarantees. The plaintiff already had them.

Looking at the circumstances here, the controlling shareholders signed the guarantee agreement without agreeing to compensation from the plaintiff for risking their personal assets on behalf of the corporation. In the *A.A. and E.B. Jones* case, shareholders only agreed to provide the guarantees in exchange for the compensation. *See id.* at 1562. The plaintiff here has not offered any evidence that the shareholders entered into the agreement because they expected to receive any guarantee fees later. Had the plaintiff and the shareholders written up such an agreement, this case might come out differently. *See Tulia III,* 3 Cl.Ct. at 366–

---

3. In fact, the plaintiff's reasoning for why it sought the guarantees is undercut by arguing that the fees were necessary. If the plaintiff sought the guarantees in order to obtain low-interest financing in 1983, the payment of additional fees of 8 percent in 1987 and 10 percent thereafter would add significant costs to the finance plan.

4. One might ask why, if the plaintiff did not promise to pay the shareholders, the shareholders would incur risk. As the plaintiff itself notes, the financing from the Bonds enabled the plaintiff to build its supermarket and to begin operating its business. (Pl.'s Br. at 5–6.) In return for their signatures, the shareholders received the protection of their investment and any profits reaped from the supermarket.

67. The plaintiff would have bargained with its shareholders to provide fees in exchange for guarantees. Each group would have provided consideration to the other. Here, the plaintiff essentially asks the Court to recognize a contractual obligation of the plaintiff that was in exchange for past consideration, which is generally insufficient to support a contract. *See Estate of Neely v. United States,* 222 Ct.Cl. 250, 256, 613 F.2d 802 (1980); *see also* 4 Richard A. Lord, Williston on Contracts § 8:9, at 193–212 (4th ed. 1992). The necessity of the finance agreement and the guarantees thus does not provide an adequate reason to provide otherwise unnecessary compensation.

### b. Fees in exchange for shareholders providing future consideration

The plaintiff also contends that it had to pay the fees in order "to assure the availability of future guarantees." (Pl.'s Br. at 7.) The Court assumes this assertion refers to promises by the shareholders to act as guarantors for the plaintiff in the future for other similar financial arrangements. However, the plaintiff has made no showing that the shareholders made any commitment to provide future guarantees in exchange for the fees paid. Without such commitment, the shareholders have no obligation to help the plaintiff in the future as guarantors, and any promise made is an empty one. A guarantor fee paid to any of these shareholders for this reason is, therefore, at best a gratuity, even if one full of hopeful expectations, and, therefore, not deductible under section 162(a).

### 3. Relationship between stock ownership and fees paid.

The relationship between the guarantee fees paid and the amount of the stock the stockholder owns may also indicate whether or not the corporation masked a dividend as an ordinary and necessary business expense.

*See Olton Feed Yard,* 592 F.2d at 276 (indicating that characteristics of dividends include proportionality of payment to stock ownership); *Tulia III,* 3 Cl.Ct. at 367 (stating that where guarantor fees are based on the amount of the guarantees and not on the amounts of stock owned, this fact "discredits the defendant's argument that the guarantor fees were really dividends in disguise."). The plaintiff asserts that the presence of disproportionate distributions discredits the argument that the fees are disguised as dividends; consequently, the plaintiff asserts, the payments are necessary business expenses.[5]

It might appear that the plaintiff made disproportionate contributions to its shareholders. By the time the plaintiff had paid out the fees, some shares had been transferred to a fourth individual, Mr. Kildow, and one of the original shareholders, Mr. Porter, had given his shares to his wife, Mrs. Porter. New shareholders Mr. Kildow and Mrs. Porter received no fees, while a nonshareholder, Mr. Porter, did receive fees. None of these events, however, prevent the Court from viewing the payment of fees as a proportional transaction.

### a. Stock owned by a spouse attributable to other spouse.

Beneficial ownership is marked by command over property or enjoyment of its economic benefits. *See Cepeda v. Commissioner,* 67 T.C.M. (CCH) 2181, 2184 (1994). The mere passage of title under state law by itself will not preclude the transferor from being taxed. *See Corliss v. Bowers,* 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916 (1930) ("[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed * * *.") Instead, a sale of stock depends upon transferring sufficient incidents of beneficial ownership. *See Cepeda,* 67 T.C.M. (CCH) at

---

**5.** There is some dispute between the parties about how much weight the court should give to proportionality. The plaintiff cites *Tulia III* for the proposition that where guarantor fees are based on the amounts of the guarantees, not on the amounts of stock owned by the guarantors, the defendant's argument that the fees are constructive dividends is discredited. (Pl.'s Br. at 13.) *Tulia III* did not indicate, however, that the presence or absence of proportionality ends the discussion. *See Tulia III,* 3 Cl.Ct. at 367. Rather, this Court reads *Tulia III* as standing for the proposition that proportionality is an important, but not dispositive element in analyzing whether or not guarantor fees by a corporation to its shareholders constitute disguised dividends.

2183. Mr. Porter continued to maintain control over the stock assets because he remained a member of the plaintiff's three-person board of directors. He, therefore, continued to own beneficially the stock he gave to his wife.

In addition to Mr. Porter's control over the corporation, the fact that he transferred the stock to his wife also suggests a continuity of ownership. Congress intended to prohibit tax avoidance through transfer of ownership within families. *See* H.R.Rep. No. 8–1337, at 36, *reprinted in* 1954 U.S.C.C.A.N. 4017, 4060; S.Rep. No. 83–162, at 45 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4621, 4675. Although Congress has not indicated its intentions on the effect of family transfers on the proportionality test, it has made itself clear in other statutes in other situations. In I.R.C. § 318(a)(1), 26 U.S.C. § 318(a)(1) (1994), for example, the Code provision dealing with constructive ownership rules for stock deems stock owned by one spouse to be owned by the other spouse. In sum, the Court imputes the distribution made to Mrs. Porter under these circumstances to her husband, Mr. Porter.

b. Nonpayment of fee to Mr. John Kildow

At the time of the payment of fees, Mr. Kildow, who owned 210 shares of stock, received nothing. Again, one could argue that, because of this lack of proportionality, the corporation did not pay out constructive dividends. Here, however, the plaintiff had reasons not to pay Mr. Kildow. Because Mr. Kildow came to the plaintiff several years after the incorporation, he had no role in the original agreement to be a guarantor, and he did not originally infuse the corporation with capital. To the extent that the controlling shareholders signed the guarantor agreement in order to protect and enhance their investment, the fees represented a return on that investment. *See, e.g., In re Lane,* 742 F.2d 1311, 1316 (11th Cir.1984) (noting in classifying transaction as debt or equity that where a corporate contributor seeks no interest payments, she will seek a share of the profits or an increase in the value of her shareholdings) (citing *Slappey Drive Ind. Park v. United States,* 561 F.2d 572, 582 (5th

Cir.1977)). Payment to Mr. Kildow would dilute that return. Since the controlling shareholders constituted all of the plaintiff's board of directors, they could determine how to cash out the investment and omit those who had not assumed any risk or did not have an interest in the venture at the time of the financing.

Alternatively, the plaintiff contends that "[t]he Board of Directors was bound by state law as all shareholders would have been entitled to share in dividends * * *." (Pl.'s Br. at 12.) It notes that the corporate laws of Texas require all shareholders to receive dividends under a dividend distribution plan. Since Mr. Kildow did not receive payments, the plaintiff argues, the payments cannot be dividend payments. The Supreme Court ruled long ago, however, that state law will control "only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law." *Burnet v. Harmel,* 287 U.S. 103, 110, 53 S.Ct. 74, 77 L.Ed. 199 (1932); *see also Estate of Chism v. Commissioner,* 322 F.2d 956, 959 (9th Cir.1963) (stating adjudications under the local law of corporations cannot control the tax treatment of the distribution). Neither sections 301 nor 316 explicitly or implicitly depend on state law. As a result, the Court must interpret these sections "so as to give a uniform application to a nationwide scheme of taxation." *Harmel,* 287 U.S. at 110, 53 S.Ct. 74. The requirements of Texas law, consequently, do not impact how the Court will construe these payments.

As for federal law, it does not require the corporation to make its dividend payouts in proportion to stockholdings, or require all shareholders to participate in the payouts, in order to consider the payouts as constructive dividends. *See Simon v. Commissioner,* 248 F.2d 869, 875 (8th Cir.1957). Constructive dividends need not exactly track the amount of stock. The Court can construe the payments here as constructive dividends even if the payments were not proportionate or to all shareholders.

Thus, although at first glance the corporation appeared not to pay out the fees based on stock ownership, the payouts tightly tie

into the amount of stock owned immediately after incorporation by the three controlling shareholders. Therefore, this factor weighs in favor of calling the transaction a constructive dividend.

#### 4. Dividend and profitability history

Where a closely-held corporation has the ability to pay dividends but instead issues shareholders guarantor fees, courts may classify these payments as constructive dividends. *See Olton Feed Yard,* 592 F.2d at 275; *Tulia I,* 513 F.2d at 803. Cash dividends represent the profit of the corporation. The corporation, of course, has the right to plow those profits right back into the corporation instead of issuing dividends. No federal statute requires profitable corporations to pay dividends. Congress has chosen instead to handle abuses in this area through the accumulated earnings tax. *See* I.R.C. §§ 531–537, 26 U.S.C. §§ 531–537 (1994). Besides the accumulated earnings tax, Congress has not indicated a desire to pursue the payment of dividends as a matter of federal tax policy. *See Elliotts, Inc. v. Commissioner,* 716 F.2d 1241, 1244 (9th Cir.1983). However, if the corporation issues other payments, the worry arises that the corporation has attempted to distribute the profits without the dividend tax consequences of nondeductibility.

Here the dividend and profitability history of the plaintiff leads the Court to conclude that the payments were constructive dividends and not ordinary and necessary business expenses. The plaintiff did not pay dividends to its shareholders during its 1992, 1993, or 1994 tax years. It earned profits during each of these years, even when it reported a net operating loss for 1992 because of the failure of its investment in Stamford Thriftway. In addition, plaintiff paid the fees out of its current or accumulated earnings.

Under all of the circumstances discussed above, the Court does not find the relationship between the dividend history and the payment of the guarantor fees coincidental. Therefore, this factor also weighs heavily in favor of calling the payment of guarantor fees to the shareholders, under these circumstances, a distribution of property in the form of constructive dividends.

In final summary, even though the defendant concedes for the purposes of this summary judgment motion that the guarantor fees paid were both reasonable in amount and customary in the plaintiff's type of business, other factors lead the Court to find in favor of the defendant. The corporation had no valid business reason to grant the shareholders the guarantor fees several years after the shareholders had already personally guaranteed the bonds for free for the plaintiff. The shareholders received fees that were directly proportional to their ownership interests in the corporation, and thus the same amounts they would have received had the corporation declared a dividend. Finally, the dividend and profitability history of the corporation placed the directors in a position to provide a dividend when instead they paid out the guarantor fees. These factors lead to a finding of a constructive dividend, not an ordinary and necessary business expense in this case.

### CONCLUSION

For the reasons set forth above, this Court holds that the plaintiff may not deduct the guarantor fees it paid to its shareholders and that a transaction of the same circumstances is a constructive dividend paid out by the corporation. As such, the defendant's Motion for Summary Judgment is granted. Accordingly, the Clerk shall enter judgment dismissing the plaintiff's Complaint.

Each party is to bear its own costs.